1

2

3

4

5

6

7                   IN THE UNITED STATES DISTRICT COURT

8                     FOR THE DISTRICT OF OREGON

9

10   LEANN CUSHMAN,                    )
                                       )     No.  CV 07-12-HU
11        Plaintiff,                   )
                                       )
12        v.                           )     FINDINGS AND
                                       )     RECOMMENDATION
13   CITY OF TROUTDALE, JAMES E.       )
     LEAKE, and MULTNOMAH COUNTY,      )
14                                     )
          Defendants.                  )
15   _____)
     MULTNOMAH COUNTY,                 )
16                                     )
          Defendant and               )
17        Third Party Plaintiff,       )
                                       )
18        v.                           )
                                       )
19   MICHAEL RAMIREZ,                  )
          Third Party Defendant.       )
20   _____)

21   Beth Creighton
     Tom Steenson
22   Steenson, Schumann, Tewksbury, Creighton
     & Rose
23   500 Yamhill Plaza Building
     815 S.W. Second Avenue
24   Portland, Oregon 97204
              Attorneys for plaintiff
25
     Gerald L. Warren
26   280 Liberty Street SE, Suite 206
     Salem, Oregon 97301
27

28   FINDINGS AND RECOMMENDATION Page 1

1    Attorney for defendants City of Troutdale
     and James E. Leake
2
Agnes Sowle
3  County Attorney
Multnomah County, Oregon
4  Jenny M. Morf
Assistant County Attorney
5  501 S.E. Hawthorne Blvd., Suite 500
Portland, Oregon 97214
6    Attorneys for defendant Multnomah County

7  Michael Ramirez aka Michael Wilson
SID No. 10913623
8  82911 Beach Access Road
Umatilla, Oregon 97882
9    Pro se

10

HUBEL, Magistrate Judge:
11
     Leann Cushman brings this action against the City of Troutdale
12
and a Troutdale Police Department lieutenant, James Leake
13
(collectively the City) and Multnomah County (the County). She
14
originally asserted claims under 42 U.S.C. § 1983, for violation of
15
her right not to be deprived of her liberty interests without due
16
process of law (against Leake); negligence (against the City and
17
the County); and intentional infliction of emotional distress
18
(against the City and the County). Cushman has voluntarily
19
dismissed the claim for intentional infliction of emotional
20
distress. Defendants have brought a third party action for
21
contribution, indemnification and comparative fault against Michael
22
Ramirez, aka Michael Wilson (Ramirez). Defendants move for summary
23
judgment in their favor on Cushman's due process and negligence
24
claims.
25
                        **Factual Background**
26
     Leann Cushman and Michael Ramirez began dating in 2002 and
27
28  FINDINGS AND RECOMMENDATION Page 2

1  were engaged in 2003. Warren Declaration, Exhibit 1 (Cushman dep.)

2  27:3-7; 47:10-11. They lived together as a couple in Chico,

3  California from September 2003 to May 2004. Cushman dep. 15:16-19.

4  After Cushman and Ramirez moved to Oregon in May and June 2004,

5  respectively, Cushman dep. 31:6-8, Cushman lived in a house owned

6  by her mother, Julie Kenney, situated at 1933 Southeast Willow

7  Parkway in Gresham. Cushman dep. 38:10-15. Ramirez used Cushman's

8  address as a mailing address, but did not live with her. Cushman

9  dep. 38:13-17; 38:24-39:2. Ramirez stayed with Cushman about two

10 nights a week; she did not know where Ramirez stayed the other five

11 nights a week. Cushman dep. 46:14-19.

12     Cushman knew that Ramirez had a probation officer and had

13 spent time in jail, but did not know why. Cushman dep. 15:21-24;

14 16:7-14; 39:8-11; 47:19-25. She also did not know what the

15 conditions of his probation were. Cushman dep. 47:19-20; 16:3-6.

16 Ramirez was under the supervision of Multnomah County Parole and

17 Probation intermittently from 2001 until October 2005. Morf

18 Declaration, Exhibit 1 (Declaration of Erick Montgomery), ¶ 2.

19 Erick Montgomery became Ramirez's Parole and Probation Officer

20 (PPO) in August 2002. Id.; See also id. at Exhibit 5 (Montgomery

21 dep.) 4:13-16. In 2005, Ramirez was on post prison supervision

22 after a 2001 conviction for 4th degree assault on his former

23 girlfriend, Brandi Larson. Montgomery Declaration ¶ 4. Ramirez had

24 a history of violence toward Larson, and Larson had a restraining

25 order against him, which Ramirez had violated multiple times. See

26 Morf Declaration, Exhibit 2 p. 10-11, 18-19, 22; id. at Exhibit 7,

27

28 FINDINGS AND RECOMMENDATION Page 3

p. 3; Exhibit 6, p. 3; Exhibit 2, p. 8, 12. Ramirez had been required by Montgomery to attend anger management classes. Morf Declaration, Exhibits 2, 11.

Cushman testified that Montgomery came to the house on Willow Parkway in August 2004 and spoke to her. Cushman dep. 39:13-24. Cushman testified that she told Montgomery Ramirez did not live with her. Cushman dep. 39:25-40:1. However, Ramirez was at the house at the time of Montgomery's visit and attempted to evade Montgomery by going outside. Cushman dep. 40:12-21. During Montgomery's home visit, Cushman called her mother and then informed Montgomery that because Ramirez did not live with her, Montgomery was not allowed to search her house. Cushman dep. 41:2-10. Cushman recalled that at the time of the visit, Montgomery left a business card, but that she "never looked at it. I just set it on the counter." Cushman dep. 44:2-9.

Despite the fact that Ramirez did not live with her and that she had told Montgomery so, Cushman wrote a note eight months later, on April 28, 2005, stating that Ramirez lived with her, that they were engaged, and that they had been together for two years. Cushman dep. 45:1-8. She wrote the note so that Ramirez could provide an address to his probation officer. Id. at 45:12-15. Cushman acknowledged at her deposition that the note was untruthful. Id. at 45:16-19.

Ramirez had previously slapped Cushman on the face on two occasions when they lived in California; police were not involved and there were no other physical assaults on Cushman by Ramirez.

FINDINGS AND RECOMMENDATION Page 4

1   Cushman dep. 23:7-19; 26:24-27:2; 31:3-11; 31:20-24; 32:12-13.
2   Cushman testified that she was not aware of any abuse of other
3   women by Ramirez, Cushman dep. 16:10-14; 17:3-5; 42:16-17. But
4   Montgomery stated at his deposition that he spoke to Cushman in
5   about May of 2003, asking Cushman to let him know if she had any
6   questions or concerns "in regards of him putting hands on her, if
7   there is going to be any of that because he has a prior history."
8   Creighton Declaration, Exhibit 1 (Montgomery dep.) 41:9-16.
9   Montgomery clarified that by "putting hands on her," he meant
10  hitting her. Id. at 17-22. Montgomery testified that he warned
11  Cushman because Ramirez's prior history made him concerned that he
12  would do it again. Id. at 42:1-7.

13      Ramirez did have a history of assault against his girlfriends,
14  including the conviction for 4th degree assault. Before 2001, he had
15  a history of gang involvement, assault, domestic violence, and
16  aggravated assault with deadly weapons. He had been arrested three
17  times for assaulting police officers. Creighton Declaration,
18  Exhibits 7, 8, 18.

19      On August 26, 2005, Gresham police came to the Willow Parkway
20  house looking for Ramirez. Cushman dep. 49:3-9. Apparently, earlier
21  that day, Montgomery had come to the house with a probation
22  violation warrant, but Cushman testified that she was not home at
23  the time, and did not remember whether she had been told about it.
24  Id. at 49:19-24. Cushman's mother, Kenney, testified that in the

25

26

27

28  FINDINGS AND RECOMMENDATION Page 5

summer of 2005,[1] a parole officer had come to the house, and that she had talked to him on the phone from work. Kenney dep. 25:18-25. Ms. Kenney recalled that the parole officer's name was Montgomery, and that he was looking for Ramirez. Kenney told Montgomery she would let Montgomery know if Ramirez came to the house. Id. at 28:3-8. Kenney testified that that Montgomery had left a card at her house. Id. at 26:1-7; 26:15-25. Cushman testified that she and her mother kept the card. Cushman dep. 181:11-22.

In September 2005, Cushman moved from the house on Willow Parkway to an apartment on Sandy Boulevard. Cushman dep. 61:9-62:2. While moving, she spent three nights at a Motel Six. Id. at 61:6. Cushman and Ramirez spent the night together at the Motel Six on September 22, 2005. Id. at 62:4-9. On Friday, September 23, 2005, Ramirez hit Cushman in the nose, grabbed the car keys out of her purse and drove off in a Toyota Camry registered to Kenney. Id. at 69:14-20. Cushman called 911 and reported that "Michael Ramirez" had hit her in the face, given her a bloody nose, and stolen a car. Id. at 71:14-17. Cushman knew Ramirez also went by the name Michael Wilson, because she had seen the name "Michael Wilson" on probation office materials that arrived at her house. Id. at 72:2-14.

Troutdale police officer David Boyce responded to Cushman's call and made a report. Cushman dep. 73:12-15; 74:13-16; Morf Declaration, Exhibit 9 (Boyce's police report). At her deposition, Cushman at first did not recall whether she gave Boyce a physical

---

[1] Kenney later testified that it could have been August 2004. Kenney dep. 27:4-19; 30:2-7.

1  description of Ramirez or told him Ramirez was on parole or
2  probation, Cushman dep. 75:4-17,[2] but then testified that she had
3  told Boyce that Ramirez was 6'2" weighed 200 pounds. Cushman dep.
4  82:13-21. Boyce's report gives the suspect's name as "Michael
5  Wilson." Morf Declaration, Exhibit 9. Boyce left his business card
6  with Cushman, id. at 77:23-25, which contained on the back the
7  phone numbers for the Multnomah County District Attorney and
8  various hotlines, including one for obtaining a restraining order.
9  Because the car Ramirez had taken was registered in Kenney's name,
10 Boyce was unable to take a stolen vehicle report from Cushman.
11 Cushman dep. 79:1-4; 120:3-11. Although Boyce took pictures of
12 Cushman's face, Cushman dep. 79:11-13, Cushman testified that she
13 told Boyce she was not interested in pressing charges against
14 Ramirez for assault; she only wanted to get the car back. Cushman
15 dep. 78:15-23; 84:19-22.

16     Cushman also told Kenney that Ramirez had "showed up at the
17 motel," and that Cushman and Ramirez got into an argument "about
18 him not being around to help us move." Kenney dep. 37:8-10. Cushman
19 told her mother Ramirez "ended up assaulting her and stealing my
20 car." Kenney dep. 37:10-12. Kenney testified at her deposition that

21

22     [2] Boyce's report states that the suspect's name is "Michael
23 Wilson." Cushman dep. 61:17-19. Cushman testified that she did
   not remember whether she told Boyce Ramirez's name was Michael
24 Ramirez or Michael Wilson. Cushman dep. 81:20-24. Boyce's report
   also states that the suspect's birthdate is July 10, 1976,
25 although the record indicates that Ramirez's birthdate is
   actually April 16, 1976. See, e.g., Creighton Declaration,
26 Exhibit 8. When asked whether she tried to mislead Boyce about
   Mr. Ramirez's identity by giving him a false birth date, Cushman
27 denied it. Cushman dep. 82:3-6.

28 FINDINGS AND RECOMMENDATION Page 7

1  Kenney had known previously that Ramirez had "gotten into some kind
2  of domestic thing" with Brandi Larson. Kenney dep. 19:2-22. Neither
3  Cushman, nor her mother called Montgomery to report Ramirez's
4  assault or the taking of the car.[3] Kenney dep. 40:17-19; 60:19-21.

5      The next day, Saturday, September 24, 2005, Cushman called
6  Boyce to ask if the police had found the car yet.  Boyce told her
7  they could do nothing about the stolen car because it was not a car
8  registered to Cushman and because, in his experience, a boyfriend
9  would only lie about permission to take the car, making prosecution
10 almost impossible. Cushman dep. 122:6-11. Kenney called Leake and
11 complained about Boyce because she did not think Boyce was taking
12 Ramirez's crimes seriously enough. Kenney dep. 55:1-25; Warren
13 Declaration, Exhibit 3 (Leake dep.) 4:5-7.

14     Cushman and Kenney went to the Troutdale Police Department and
15 had a conversation with Leake. Leake took stolen vehicle
16 information from Kenney. Cushman dep. 124:25-125:2. During the
17 meeting with Leake, Cushman gave him a birthdate for Ramirez of
18 April 16, 1976, and a name of Michael Wilson Ramirez. Cushman dep.
19 131:4-11.[4] However, apparently because Boyce's report showed a name
20 of Michael Wilson and an incorrect birthdate, LEDS generated no
21 information when Leake tried to run a check. Leake dep. 19:22-24.

22     Cushman has testified that Leake told them to go to places
23 frequented by Ramirez and, if they saw the car, to call and let him

24

25     [3] Despite Montgomery's testimony that he had recently told
   Cushman to call him if Ramirez "laid hands" on her.
26
27     [4] Information obviously different from what Cushman had
   provided to Boyce the day before.

28 FINDINGS AND RECOMMENDATION Page 8

1    know. Cushman dep. 126:17-19. Leake confirms this. Leake dep. 21:1-
2    13.

3        During the meeting with Leake, Cushman said she wanted to
4    press charges against Ramirez for the assault, Kenney Declaration
5    ¶ 10; Leake dep. 24:10-11, and told Leake Ramirez was on probation.
6    Cushman dep. 185:18-186:4. Leake has testified that Kenney asked
7    him to contact Ramirez's probation officer and inform him of the
8    new charges. Leake dep. 4:19-22. Cushman and Kenney did not have
9    the telephone number for Montgomery, but they told Leake the
10   probation officer's name was Erick Montgomery. Cushman dep. 185:18-
11   186:4; Kenney Declaration ¶ 9. Neither Cushman nor Kenney tried to
12   contact Montgomery after speaking to Leake. Cushman dep. 186:5-8;
13   Kenney Declaration ¶ 9.

14       Leake has testified that he called a central Multnomah County
15   Parole and Probation office number and left a message for Erick
16   Montgomery. Leake dep. 6:4-10; 7:18-23; 8:1-20. Leake stated that
17   in his message, he left his cell phone number and asked "to please
18   have someone call me right away." Leake dep. 8:15-20. The County
19   disputes the existence of such a call. County Exhibit 1, ¶ 5;
20   Exhibit 5, 4:7-10; 12 (Request for Admissions) Numbers 1, 5-7, 8-9
21   and 12. Leake testified that he did not know the telephone number
22   he called or where he got the number and did not remember the
23   voicemail greeting he heard when he called. Leake dep. 2:6-14;
24   2:23-25; 3:1-3; 4:7-12; 5:1-3. Montgomery and the receptionists
25   answering the phone at Montgomery's office deny receiving a call
26   from Leake. Montgomery Declaration ¶ 5; Montgomery dep. 4:7-10;

27

28   FINDINGS AND RECOMMENDATION Page 9

1  Exhibit 12, Request for Admissions No. 1, 5-7, 8-9 and 12.

2      On Monday, September 26, 2005, Ramirez called Cushman and told
3  her he would drop the Camry off at a Safeway parking lot in
4  Gresham. Cushman dep. 136:22-138:17. Ramirez was not aware that
5  Cushman had reported him to the police, although on September 26,
6  2005, pursuant to standard Troutdale Police Department procedures,
7  a copy of the reported assault on Cushman was faxed to the Domestic
8  Violence Unit of the Multnomah County District Attorney's Office.
9  The evidence does not reveal whether Ramirez was aware of this
10  report.

11      Leake went on vacation September 25, 2005, and did not return
12  to the office until October 12, 2005. Leake dep. 5:21-25; 7:10-13.
13  According to Kenney, Leake did not tell Cushman and Kenney during
14  his meeting with them that he was leaving for a two week vacation.
15  Kenney Declaration ¶ 11. The City admits that Leake was out of cell
16  phone range while on vacation, and that he did not change his
17  outgoing voice mail message to inform callers that he was
18  unavailable or have his calls forwarded to another number.
19  Plaintiff's CSF ¶ 21. The City also admits that Kenney called
20  Leake's cell phone several times, leaving messages about where
21  Ramirez was going to leave the car and asking to have an officer
22  there to arrest him, but that Leake did not respond to these calls.
23  Plaintiff's CSF ¶ 22.

24      Leake did not follow up with Montgomery after he returned from
25  his vacation. Plaintiff's CSF ¶ 23.

26  ///

27

28  FINDINGS AND RECOMMENDATION Page 10

1    Montgomery testified that he never received any report of the

2 September 23, 2005 assault on Cushman. Montgomery Declaration ¶ 5.

3    On October 8, 2005, Ramirez telephoned Cushman and asked to

4 come to her apartment to get clothes she had kept for him. Cushman

5 dep. 144:16-17. Cushman was not afraid that Ramirez would harm her

6 and did not call the police or relatives to report his arrival.

7 Cushman dep. 162:5-19. Ramirez came to her apartment about 4:00 or

8 4:30 in the afternoon. Cushman dep. 150:11-13. Cushman invited

9 Ramirez into her apartment, where they ate a meal, drank beer and

10 tequila together, and watched a movie. Cushman dep. 162: 20-165:24.

11 During the movie, Ramirez remarked that Cushman "was going to set

12 him up and wasn't saying why." Cushman dep. 176:11-16. At about

13 8:00 p.m., Cushman began to suspect that Ramirez was under the

14 influence of methamphetamines. Cushman dep. 178:9-20.

15    Cushman testified that she was aware Ramirez sometimes used

16 methamphetamine. Cushman dep. 42:22-43:2. However, she did not call

17 the police or leave her apartment, even though Ramirez had not

18 prevented her from leaving. Cushman dep. 167:1-3; 176:24-177:2.

19    At about 9:30 p.m., Ramirez suddenly attacked Cushman with a

20 knife, stabbing her and cutting her throat, then fleeing the scene.

21 Amended Complaint ¶ 12; Morf Declaration, Exhibit 14 (police report

22 for October 8, 2005). Cushman called 911 at 9:29 p.m. and reported

23 the attack.

24    On October 10, 2005, Kenney called Montgomery and told him

25 about the attack on Cushman. Montgomery Declaration ¶ 5. Montgomery

26 initiated a warrant, contacted Portland and Gresham police, and

27

28 FINDINGS AND RECOMMENDATION Page 11

1 requested that Ramirez be taken into custody. Id. A warrant was
2 issued that day, but Ramirez was not apprehended until October 13,
3 2005, when his sister reported his whereabouts to the police. Id.
4 Ramirez has since pleaded guilty to attempted murder and is
5 currently incarcerated. Montgomery Declaration, ¶ 9.

6 **Standard**

7 A party is entitled to summary judgment if the "pleadings,
8 depositions, answers to interrogatories, and admissions on file,
9 together with affidavits, if any, show there is no genuine issue as
10 to any material fact." Fed. R. Civ. P. 56(c). Summary judgment is
11 not proper if material factual issues exist for trial. Warren v.
12 City of Carlsbad, 58 F.3d 439, 441 (9th Cir. 1995). A genuine
13 dispute arises "if the evidence is such that a reasonable jury
14 could return a verdict for the nonmoving party." State of
15 California v. Campbell, 319 F.3d 1161, 1166 (9th Cir. 2003). Where
16 the record taken as a whole could not lead a rational trier of fact
17 to find for the non-moving party, there is no genuine issue for
18 trial. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S.
19 574, 587 (1986).

20 On a motion for summary judgment, the court must view the
21 evidence in the light most favorable to the non-movant and must
22 draw all reasonable inferences in the non-movant's favor. Clicks
23 Billiards Inc. v. Sixshooters Inc., 251 F.3d 1252, 1257 (9th Cir.
24 2001). The court may not make credibility determinations or weigh
25 the evidence. Lytle v. Household Mfg., Inc., 494 U.S. 545, 554-55
26 (1990). "Credibility determinations, the weighing of the evidence,

27

28 FINDINGS AND RECOMMENDATION Page 12

1  and the drawing of legitimate inferences from the facts are jury
2  functions, not those of a judge." Reeves v. Sanderson Plumbing
3  Products, Inc., 530 U.S. 133, 150 (2000). Where different ultimate
4  inferences may be drawn, summary judgment is inappropriate.
5  Sankovich v. Ins. Co. of N. Am., 638 F.2d 136, 140 (9th Cir. 1981).

6  **Discussion**

7  1. County's motion for summary judgment

8  Cushman asserts in her complaint that "assuming Leake
9  telephoned Montgomery on September 24, 2005," the County was
10 negligent in not having Ramirez arrested prior to October 8, 2005.
11 Amended Complaint ¶¶ 13 and 21-24.

12 The County asserts that it is entitled to summary judgment on
13 Cushman's negligence claim because 1) the County's alleged
14 negligent conduct was not the "but for" cause of Cushman's
15 injuries, and 2) the County did not act unreasonably in light of a
16 reasonably foreseeable risk that Ramirez would attempt to harm
17 Cushman.

18 The complaint alleges that had the County arrested Ramirez
19 before October 8, 2005, Cushman would not have injured, see Amended
20 Complaint ¶ 13, presumably because if Ramirez had been in jail he
21 could not have come to Cushman's apartment and assaulted her. The
22 County argues that Cushman herself gave Ramirez the opportunity to
23 harm her.

24 The County cites McPherson v. State of Oregon, 210 Or. App.
25 602 (2007), a case in which the court held that defendants' failure
26 to adequately light an apartment complex or equip its laundry shed
27
28 FINDINGS AND RECOMMENDATION Page 13

1 was the cause of an assault on residents of the apartment complex

2 by an escaped convict. Id. at 608-09.

3     The County distinguishes the causation analysis of McPherson

4 from the facts of this case, arguing that in this case, unlike

5 McPherson, the conduct that put Cushman into harm's way was

6 Cushman's own. Defendants point out that Cushman did not call

7 Montgomery herself at any time prior to October 8, 2005, even

8 though Cushman knew Montgomery's name, had his card in her

9 possession, and had been previously warned by Montgomery to call

10 him if Ramirez hit her. Cushman did not tell the police or anyone

11 else that Ramirez was coming to see her on October 8, 2005, and she

12 let him into her apartment, spent five hours or more alone with

13 him, drinking, eating and watching movies, and did not attempt to

14 leave or call for help even after Ramirez made the comment about

15 Cushman setting him up and her suspicion that that Ramirez was high

16 on methamphetamines. The County argues that Cushman's own conduct

17 was the "but for" cause of her injury.

18     The flaw in the County's argument is its assumption that Leake

19 did not make the phone call to Montgomery. This is a disputed fact.

20 If a jury found that Leake did leave a message for Montgomery, the

21 jury could also reasonably conclude that the County was negligent,

22 either by not ensuring that Montgomery got the message or because

23 Montgomery failed to respond to the information and obtain an

24 arrest warrant. The factual dispute about whether Leake did or did

25 not leave a message for Montgomery precludes summary judgment for

26 the County on the "but for" element of the negligence case.

27

28 FINDINGS AND RECOMMENDATION Page 14

The County argues that Cushman's negligence claim also fails under a general foreseeability theory, because of Ramirez's intervening criminal acts. The County argues that it is not liable unless Cushman can establish that her injury by Ramirez's criminal acts was reasonably foreseeable, and that the County unreasonably created the risk of the harm that befell her--in other words, that the County provided more than "mere facilitation" of Ramirez's criminal acts. <u>Fraker v. Benton County Sheriff</u>, 214 Or. App. 473, 490 (2007); <u>Buchler v. Oregon Corrections Div.</u>, 316 Or. 499, 511-14 (1993)(en banc); <u>Panpat v. Owens-Brockway Glass Container</u>, 188 Or. App. 384, 393 (2003).

In <u>Fraker</u>, the husband and stepfather of plaintiffs, a mother and her two daughters, held plaintiffs hostage in their home for several hours before freeing them and killing himself. Fraker's stepdaughters had accused Fraker of sexual abuse, and the ensuing investigation resulted in a criminal indictment against Fraker. Fraker told his friend and coworker, defendant Cottengim, that he had a gun and that he was going to kill plaintiffs and himself. Cottengim convinced Fraker to give her the gun, which she put in the trunk of her car. She did not inform authorities of Fraker's threats.

After a hearing, Fraker was placed on home detention. Cottengim agreed to allow Fraker to reside in her apartment in Corvallis during his detention period.

On December 22, 1998, Fraker was permitted to leave Cottengim's residence in Corvallis to meet his attorney in Newport.

FINDINGS AND RECOMMENDATION Page 15

1 After the meeting, Fraker forced his way into plaintiffs' house,
2 doused the interior with gasoline, held plaintiffs hostage, and
3 threatened to kill them and himself. After many hours, Fraker
4 released plaintiffs and killed himself.

5    The issue presented in <u>Fraker</u> was whether Cottengim was liable
6 for negligence under a general foreseeability theory. The court
7 held that for "liability to attach under a general foreseeability
8 theory, a trier of fact must be able to find that there was a
9 reasonably foreseeable risk of harm to the plaintiff and that the
10 defendant's conduct was unreasonable in light of that risk." 214
11 Or. App. at 490, citing <u>Buchler</u>, 316 Or. at 511-14.

12    Intentional intervening criminal acts of a third person do not
13 necessarily make the harm suffered by the plaintiff unforeseeable
14 to the defendant, <u>Fraker</u>, 214 Or. App. at 490, but the plaintiff
15 must show it was reasonably foreseeable to defendant that plaintiff
16 would suffer harm as a result of those criminal acts and that the
17 defendant provided more than "mere facilitation" of the third
18 party's criminal acts. <u>Id.</u> Whether an injury was foreseeable
19 usually presents an issue of fact. <u>Id.</u>

20    Cottengim testified that she knew the following: Fraker's
21 stepdaughters were "responsible" for the indictment against him;
22 Fraker's wife supported her daughters' allegations and had
23 initiated dissolution proceedings against Fraker; Fraker was
24 concerned about going to jail, particularly because he was afraid
25 that as a sexual predator he would be raped in prison; and Fraker
26 had indicated that he would rather kill himself than go to prison.

27

28 FINDINGS AND RECOMMENDATION Page 16

1   The court, reversing summary judgment in Cottengim's favor,
2   held that a question of fact existed on the issue of
3   foreseeability. The court held that if the jury believed
4   plaintiffs' evidence that Cottengim knew about Fraker's previous
5   history of breaking into plaintiffs' house; knew Fraker was alarmed
6   about the prospect of going to prison; knew Fraker had threatened
7   plaintiffs' lives and his own, and that Cottengim had not disclosed
8   Fraker's threats and had made her car, with the gun in the trunk,
9   available to Fraker, the jury could find that it was reasonably
10  foreseeable that Fraker would go to plaintiffs' house and threaten
11  or harm them. 214 Or. App. at 490-91. The court relied on other
12  cases holding that the foreseeability of a third party's actions
13  can turn on the knowledge of the third party's propensity for
14  violence, knowledge indicating that the third party posed a danger
15  to the plaintiff, and the defendant's having placed the plaintiff
16  in a vulnerable situation.[5]

17  The Fraker court contrasted its holding with that of Buchler,
18  where a prisoner took advantage of keys left in a forest work crew
19  van and escaped. Two days later, the prisoner shot two people with

20

21  _____

22  [5] See, e.g., Cunningham, 157 Or. App. at 338-39 (defendant
    tavern placed intoxicated plaintiff in vulnerable situation by
23  forcing her to leave premises before she could call for a ride
    home; foreseeable that plaintiff would come to harm as result of
24  criminal acts by others); Washa v. DOC, 159 Or. App. 207, 225
    (1999),aff'd by an equally divided court, 335 Or. 403 (2003)
25  (general foreseeability analysis in negligent supervision claim
    turned on whether, in light of the third party's criminal
26  history, the defendant could reasonably foresee that inadequate
    supervision of third party would lead to conduct that harmed
27  plaintiff).

28  FINDINGS AND RECOMMENDATION Page 17

a gun he had stolen in a burglary of his mother's residence.
Plaintiff and plaintiff's decedent brought an action against the
Oregon Corrections Division. The prisoner's prior record included
property crimes, but no crimes of violence. Defendant knew only
that the prisoner might have had a "violent temper" during
childhood and that he had a long-standing drug problem. 316 Or. at
502.

Plaintiffs alleged that defendant was negligent in permitting
the prisoner to escape, failing to recapture him, and failing to
warn the public of the escape, particularly those, like plaintiffs,
living near the mother's home. Id.

The Buchler court held:

> While it is generally foreseeable that criminals may
> commit crimes and that prisoners may escape and engage in
> criminal activity while at large, that level of
> foreseeability does not make the criminal's acts the
> legal responsibility of everyone who may have contributed
> in some way to the criminal opportunity. ... [M]ere
> "facilitation" of an unintended adverse result, where
> intervening intentional criminality of another person is
> the harm-producing force, does not cause the harm so as
> to support liability for it.

316 Or. at 511-12.

The Fraker court acknowledged Buchler's holding, but concluded
that Fraker's criminal conduct was a risk directly related to
Cottengim's failure to report Fraker's threats and to her giving
him access to a gun. 214 Or. App. at 491-92. I note that in Fraker,
there were also specific foreseeable victims.

Also instructive is Panpat, where the court found a triable
issue of fact on whether an employee, Blake, posed a foreseeable
danger to a co-worker with whom he had been romantically involved.

FINDINGS AND RECOMMENDATION Page 18

Blake came to the workplace and took decedent into a bathroom at gunpoint. After the police arrived and ordered Blake out of the bathroom, Blake killed decedent and himself.

The employer knew that Blake had a history of mental illness, including intermittent explosive disorder, in the context of Blake's breakup with his former wife. The employer also knew Blake was distraught over his breakup with decedent, suffering from depression and substance abuse, that he had had two verbal confrontations with decedent at work, and that he was on not authorized to return to work from medical leave until he had seen a psychiatrist or psychologist.

The Panpat court relied on two earlier cases, Washa, 159 Or. App. at 224, and Cunningham v. Happy Palace, Inc., 157 Or. App. 334 (1998). In Washa, the court held that the third party's history of violence, at least insofar as it was or should have been known to the defendant, played an important role in determining whether the harm was reasonably foreseeable. 159 Or. App. at 224. In Cunningham, the court held that plaintiff's harm was foreseeable after she was forced to leave the premises before she could telephone for a ride home. 157 Or. App. at 338. The court held that the bar's conduct constituted more than "mere facilitation" of the harm to the plaintiff, because there was evidence that the defendant knew intoxicated people were impaired and thus more likely to be injured or be the victims of crime. Id. at 339-40.

I conclude that this case is factually closer to Fraker and Panpat than to Buchler. Like Fraker and Panpat, this case involves

FINDINGS AND RECOMMENDATION Page 19

1   a situation in which there is a question of fact about what the

2   County knew or should have known about the specific danger a

3   particular person, Ramirez, posed to a particular victim, Cushman.

4   The County, through Montgomery, had knowledge of Ramirez's past

5   history of violence, particularly domestic violence, and Montgomery

6   was concerned enough about Ramirez's propensities to warn Cushman.

7   Buchler, on the other hand, involved only a generalized risk that

8   escaped criminals would be likely to commit more crimes. In

9   Buchler, the escapee had no history of violent crimes, unlike

10   Ramirez. I conclude that a reasonable jury could find the County

11   unreasonably created a risk of harm to Cushman.

12        2.   City's motion for summary judgment

13           a.   Due process claim/state created danger

14      Cushman's due process claim is based on a "state created

15   danger" theory, with the contention that Leake affirmatively placed

16   her in danger, and did so with deliberate indifference to the

17   danger. See Kennedy v. City of Ridgefield, 439 F.3d 1055, 1062 (9th

18   Cir. 2006)(state actors may be held liable where they affirmatively

19   place an individual in danger, by acting with deliberate

20   indifference to a known or obvious danger).

21           1)   Affirmative act of endangerment

22      In general, the state is not liable for its omissions. Estate

23   of Amos ex rel. Amos v. City of Page, Arizona, 257 F.3d 1086, 1090

24   (9th Cir. 2001), citing DeShaney v. Winneago County Dep't of Soc.

25   Servs., 489 U.S. 189, 195 (1989).

26      Nothing in the language of the Due Process Clause itself
        requires the State to protect the life, liberty and

27

28   FINDINGS AND RECOMMENDATION Page 20

property of its citizens.... The Clause is phrased as a limitation on the State's power to act, not as a guarantee of certain minimal levels of safety and security. It forbids the State itself to deprive individuals of life, liberty, or property without 'due process of law' but its language cannot fairly be extended to impose an affirmative obligation on the State to ensure that those interests do not come through other means.

489 U.S. at 195.

An exception to the general rule that a state's failure to protect an individual from danger does not constitute a violation of the Due Process Clause is the "danger creation" exception, which exists when the state affirmatively places the plaintiff in a dangerous situation. Amos 257 F.3d at 1091.

In the Ninth Circuit, the "danger creation" exception begins with Wood v. Ostrander, 879 F.2d 583, 588-90 (9th Cir. 1989). In Wood, the court held that a woman who was raped by a third party could assert a claim under 42 U.S.C. § 1983 against a police officer who had stopped the car in which the plaintiff was riding, arrested and removed the driver, impounded the car, and left the plaintiff stranded in a high crime area. The court allowed her claim to go forward because the jury could find that the officer affirmatively created the particular danger of third party violence to which plaintiff was exposed.

In L.W. v. Grubbs, 974 F.2d 119 (9th Cir. 1992), plaintiff was a nurse employed by the state at a medium security custodial institution for juvenile male offenders. Despite representations by her supervisors that plaintiff would not be required to work alone with violent sex offenders, the supervisors designated a violent

FINDINGS AND RECOMMENDATION Page 21

1  sex offender inmate to work in proximity with her. The inmate had
2  failed all treatment programs at the institution, and was
3  considered very likely to commit a violent crime if left alone with
4  a woman. The inmate assaulted and raped plaintiff. The court held
5  that the supervisors were liable for placing plaintiff in a
6  position of known danger.

7      In Penilla v. City of Huntington Park, 115 F.3d 707 (9th Cir.
8  1997), plaintiff's decedent, Penilla, fell seriously ill on the
9  porch of his home. His neighbors called 911 for emergency medical
10 services. Two police officers responded and examined Penilla,
11 finding him in critical need of medical care. Nevertheless, the
12 officers cancelled the request for paramedics, broke into Penilla's
13 house, dragged Penilla inside, and locked the door, leaving Penilla
14 inside by himself. The next day, Penilla's family found him dead in
15 the house. The court held that the officers' affirmative conduct
16 placed Penilla in a more dangerous position than when they found
17 him.

18     In Munger v. City of Glasgow Police Dept., 226 F.3d 1082 (9th
19 Cir. 2000), the court applied the "danger creation" exception to
20 deny qualified immunity to officers who allegedly ejected an
21 intoxicated patron from a bar into subfreezing temperatures without
22 adequate clothing; the patron died of exposure. The court said:

23         In examining whether an officer affirmatively places an
           individual in danger, we do not look solely to the agency
24         of the individual, nor do we rest our opinion on what
           options may or may not have been available to the
25         individual. Instead, we examine whether the officers left
           the person in a situation that was more dangerous than
26         the one in which they found him.

27

28 FINDINGS AND RECOMMENDATION Page 22

227 F.3d at 1086.

In Amos, the court rejected the plaintiff's argument that the "danger creation" applied to a situation in which a motorist fled the scene of an accident into the desert and the police conducted a deficient and ineffectual police search. The court held that the police had not engaged in any affirmative act which left the plaintiff in a more dangerous position than the one in which they found him. The police arrived after the accident had occurred and after Amos had disappeared into the desert; there was no interaction between the officers and Amos. Thus, "while the State may have been aware of the dangers that [Amos] faced it played no part in their creation, nor did it do anything to render him any more vulnerable to them." 257 F.3d at 1091, quoting DeShaney v. Winneago County Dep't of Soc. Servs., 489 U.S. 189, 201 (1989). The court concluded that Amos was in great danger before the officers appeared, so the probability that the officers' poor rescue attempt made Amos worse off than no attempt at all was "extremely speculative." Id.

Cushman counters with the Kennedy case. In that case, Kennedy called the Ridgefield Police Department to report that Burns, a neighbor, had molested her daughter. 439 F.3d at 1057. Kennedy told police officer Shields that Burns was unstable and violent. Id. at 1058. Shields told Kennedy she would be given prior notice before the police contacted Burns, but despite this assurance, Shields contacted Burns's mother, informing her of Kennedy's allegations, without giving Kennedy prior notice. When Kennedy learned that

FINDINGS AND RECOMMENDATION Page 23

1  Shields had notified Burns's mother without telling her first, she
2  expressed concerns for her safety. Shields assured Kennedy that the
3  police would patrol the area around her house to watch for Burns,
4  and based on these assurances, Kennedy stayed at home. Burns broke
5  into the home and shot both Kennedy and her husband in their sleep.

6       The court held that a jury could find Shields "unreasonably
7  created a false sense of security in plaintiffs by agreeing to give
8  plaintiff advance notice ... and assuring the plaintiffs of a
9  neighborhood patrol." Id. at 1059. Cushman argues that Leake's
10 telling Cushman and Kenney that he would call Montgomery kept them
11 from calling Montgomery themselves, thereby creating a false sense
12 of security just as Shields had done in Kennedy.

13      I conclude that under the Kennedy case, Cushman has
14 demonstrated a genuine issue of material fact on danger creation.
15 She has produced evidence that Ramirez, a man with a history of
16 assault and violence, assaulted her on September 23, 2005. A
17 reasonable jury could conclude that Leake affirmatively put Cushman
18 at risk for harm by assuring her he would call Montgomery, possibly
19 failing to do so, then leaving for a two week vacation without
20 following up with Montgomery and without leaving Cushman a means of
21 contacting him or some other informed person within the police
22 department.

23                  (2)  Deliberate indifference
24      The City asserts that the absence of any evidence of
25 deliberate indifference is also fatal to Cushman's due process
26 claim. The City relies on County of Sacramento v. Lewis, 523 U.S.

27

28 FINDINGS AND RECOMMENDATION Page 24

833 (1998). In that case, the Supreme Court addressed the question of whether a police officer violated the due process guarantee by causing death through deliberate or reckless indifference after a high speed automobile chase aimed at apprehending a suspected offender. The Court held that in such circumstances, "only a purpose to cause harm unrelated to the legitimate object of arrest will satisfy the element of arbitrary conduct shocking to the conscience, necessary for a due process violation." Id. at 836. The Court reviewed prior cases holding that liability for negligently inflicted harm is beneath the threshold for a constitutional due process claim. Id. at 849. See also Kennedy, 439 F.3d at 1064 (gross negligence is insufficient to support a due process violation claim, and plaintiff must establish "deliberate indifference to a known, or so obvious to imply knowledge of, danger").

Cushman has not, in her brief, challenged the City's assertion that she has not proffered evidence of deliberate indifference.

I recommend that the City's motion for summary judgment on the due process claim be granted for failure to proffer evidence of deliberate indifference, and that this claim be dismissed.

b. Negligence claim

The City asserts that even assuming Leake failed to call Montgomery, no reasonable juror could conclude that Leake could have foreseen that not contacting Ramirez's probation officer created an unreasonable danger to Cushman. The City points out that, at most, Leake was aware that Cushman had been struck in the

FINDINGS AND RECOMMENDATION Page 25

face by Ramirez; there is no evidence that he was aware Ramirez had hit Cushman when they lived in California, or that Ramirez had a domestic assault charge relating to his former girlfriend, or knew Ramirez's criminal history, though Cushman had told him Ramirez was on probation or parole.

Cushman counters that there were policies at the police department regarding domestic violence victim assistance, and that because of these policies it was foreseeable that Leake's "lack of concern for Cushman's safety and repeated reassurances would provide her with a false sense of security, which would contribute to giving Ramirez access to Cushman the night of the assault." Plaintiff's Memorandum, p. 15. A reasonable jury could find that the harm to Cushman was foreseeable, given Leake's assurance that he would call Montgomery, his failure to tell Cushman that he was leaving for a two week vacation during which he would be unreachable, and his failure to ensure, before leaving, that Ramirez would be arrested.

I recommend that the motions of the County and the City for summary judgment on the negligence claim (doc. ## 54, 49) be DENIED, and the City's motion for summary judgment on the due process claim (doc. # 54) be GRANTED.

### Scheduling Order

The above Findings and Recommendation will be referred to a United States District Judge for review. Objections, if any, are due February 10, 2009. If no objections are filed, review of the Findings and Recommendation will go under advisement on that date.

FINDINGS AND RECOMMENDATION Page 26

If objections are filed, a response to the objections is due February 24, 2009, and the court's review of the Findings and Recommendation will go under advisement with the District Judge on that date.

Dated this 26th day of <u>January</u>, 2009.

/s/  Dennis James Hubel
Dennis James Hubel
United States Magistrate Judge

FINDINGS AND RECOMMENDATION Page 27